SOUTHERN RAILWAY COMPANY *et al. v.* CITY OF
MEMPHIS.*

(*Jackson.* April Term, 1912.)

1. EMINENT DOMAIN. Inherent attribute of sovereignty,
   without limitation, except as limited by the constitution.

The power of eminent domain is an inherent attribute of sover-
eignty, without limitation or restriction, except and subject to
the constitutional limitation that private propery cannot be
taken for private purposes at all, nor for a public use without
compensation. (*Post, p.* 281.)

Constitution cited and construed: Art. 1, sec. 21.

2. SAME. Whether taking is for a private or public use and
   whether statute provides for ascertainment of value and pay-
   ment thereof, are judicial questions; and all other questions
   are political.

Whether the attempted taking of private property is for a private
or public use, and, where the taking is for a public use, whether
the statute authorizing the taking for a public use provides
a sufficient and adequate procedure for the ascertainment of
the fair value of the property to be taken, and payment in
cash, or sufficient security, are judicial questions confided to
the courts; but all other incidents of the taking are political
questions, for the determination of the sovereign, and not
judicial questions, for the determination of the courts. For
instance, the selection of the property to be taken, as con-
tradistinguished from similar property in the same locality;
the determination of its suitableness for the public use to which
it is proposed to be put; and the quantity of the property

---

*Condemning railroad lands for municipal purposes, see note in
2 L. R. A. (N. S.), 227.

required, are all political questions, not subject to judicial review. (*Post, pp.* 281-283.)

Cases cited and approved: Anderson v. Turbeville, 6 Cold., 150; White v. Railroad, 7 Heisk., 537; Ryan v. Terminal Co., 102 Tenn., 116; Water Co. v. Scott, 111 Tenn., 328; Memphis v. Hastings, 113 Tenn., 142; Railroad v. Cemetery Co., 116 Tenn., 400; Kohl v. United States, 91 U. S., 367; United States v. Fox, 94 U. S., 320; Boom Co. v. Patterson, 98 U. S., 406; Shoemaker v. United States, 147 U. S., 282; Navigation Co. v. United States, 148 U. S., 327; United States v. Railroad, 160 U. S., 668; Isom v. Railroad, 36 Miss., 300; Railroad v. Chicago, 141 Ill., 602.

3. **SAME. Particular property may be selected for public use by legislative enactment.**

Particular property belonging to a particular citizen can be selected directly for the public use by legislative enactment. (*Post, p.* 283.)

Cases cited and approved: Anderson v. Turbeville, 6 Cold., 150; Railroad v. Cemtery Co., 116 Tenn., 400; Shoemaker v. United States, 147 U. S., 282.

4. **SAME. Public parks are for a public use.**

Public parks are for the benefit of the public, and property taken for such uses falls within a proper exercise of the power of eminent domain. (*Post, pp.* 283, 284.)

Cases cited and approved: Memphis v. Hastings, 113 Tenn., 142; Shoemaker v. United States, 147 U. S., 282; United States v. Railroad, 160 U. S., 668.

5. **SAME. Property devoted to a public use cannot be taken for another public use without legislative warrant.**

Property devoted to a public use, so selected and set apart by proper legislative authority, cannot be taken for another and inconsistent public use, in the absence of legislation expressly or impliedly warranting it. (*Post, p.* 284.)

Case cited and approved: Railroad v. Cemetery Co., 116 Tenn., 400.

Railroad v. Memphis.

6. **SAME.   Same.   Statute authorizing the taking of specific property devoted to a public use for another inconsistent public use, upon compensation, is not unconstitutional for that reason.·**

The statute (Acts 1909, ch. 141), authorizing the city of Memphis to take the property known as the "Southern Railway Company yards," including its switchyards, in said city, for park purposes, and authorizing said city to pledge its credit for the payment of the bonds to be issued to pay for the property, expressly selects and authorizes the taking of property devoted to a public use to be appropriated to another public use inconsistent therewith, and is not in conflict with the constitutional provision (art. 1, sec. 8) forbidding the deprivation of property except by the law of the land, nor with the constitutional provision (art. 1, sec. 21) forbidding the taking of property for private use at all, and the taking for a public use without just compensation, nor with the constitutional provision of the federal constitution (14th am.) guaranteeing the equal protection of the laws, because the power of eminent domain exists independent of the constitution and is only limited by it, and the power to take property for public purposes includes the power to select the property to be taken.   (*Post, pp.* 284-286.)

Acts cited and construed:   Acts 1909, ch. 141.

Constitution cited and construed:   Art. 1, secs. 8 and 21 (State); 14th am. (U. S.).

Cases cited, approved, and distinguished:   Jones v. Perry, 10 Yerg., 60; Mayor v. Dearmon, 2 Sneed, 104; Brown v. Haywood, 4 Heisk., 357; McKinney v. Hotel Co., 12 Heisk., 104; Memphis v. Fisher, 9 Bax., 240; Ragio v. State, 86 Tenn., 272; Stratton v. Morris, 89 Tenn., 497; Sutton v. State, 96 Tenn., 696; State v. Railroad, 124 Tenn., 1; Fleming v. Memphis, 126 Tenn., 331.

7. **SAME.   Same.   Same.   Statute authorizing the taking of specific property, provided it can be acquired for not exceeding a certain sum, is not unconstitutional as not providing just compensation.**

The statute (Acts 1909, ch. 141), authorizing the city of Memphis,

Railroad v. Memphis.

through its park commission, to acquire certain specified property for park purposes, provided not more than five hundred thousand dollars shall be paid therefor, under private negotiation or condemnation, authorizes the said city to invest a sum not exceeding that amount in the acquisition of the property; and the park commission is authorized to investigate the value of the property, and to determine whether it can be acquired for a sum not exceeding the said maximum amount, either by private negotiation or condemnation; and the statute is not unconstitutional for failure to provide adequate method of just compensation, for the reason that, if the commission, as the city's agent, upon investigation, determines that the property is worth more than the said maximum sum fixed, the right to exercise the power of eminent domain does not exist. (*Post*, *pp*. 286-289.)

Acts cited and construed: Acts 1909, ch. 141, sec. 4.

Cases cited and approved: Water Co. v. Scott, 111 Tenn., 321; Memphis v. Hastings, 113 Tenn., 142.

8. **SAME. Same. Same. Same. Statute authorizing the taking of specific property at a maximum price does not authorize the taking if the property is worth more, and is constitutional.**
The legislature, in authorizing the taking of certain specific property for a public use, may fix the maximum price at which the property may be acquired; and where the property cannot be acquired for the maximum sum, the power of eminent domain cannot be exercised, because it is a condition precedent to taking possession of the property condemned that the adjudged value be paid into the registry of the court or secured by bond. (*Post*, *pp*. 288, 289.)

Acts cited and construed: Acts 1909, ch. 141, sec. 4.

Cases cited and approved: Cunningham v. Terminal Co., 126 Tenn., 343; Shoemaker v. United States, 147 U. S., 282; United States v. Railroad, 160 U. S., 668.

Railroad v. Memphis.

9. SAME. Procedure for ascertaining value must be regulated by legislation.

The procedure for ascertaining the value of the property sought to be condemned is a matter of legislative regulation. (*Post, p.* 289.)

Case cited and approved:  Railroad v. Nesbit, 10 How., 395.

10. SAME. Same. Procedure is clearly defined by Code and decisions.

The procedure in condemnation suits is well established and well understood in this State, and is clearly defined by our Code and the decisions of the supreme court construing it. (*Post, pp.* 289, 290.)

11. SAME. Same. Same. Statute authorizing acquisition of specific property for public use at a maximum value was passed with reference to established procedure; no acquisition if value exceeds maximum.

The statute (Acts 1909, ch. 141), authorizing the city of Memphis to acquire, by condemnation or negotiation, certain specified property for park purposes, and fixing the maximum price which the city is authorized to pay therefore, was passed with reference to the then established mode of procedure for ascertaining the value of property sought to be taken in such cases; and where the investigation according to the statutory procedure develops the fact that the fair valuation of the property does not exceed the said maximum sum, the said city may acquire the property; but if such investigation shows that the said property is worth more than the said maximum sum, said city's power to acquire it under said statute is at an end. (*Post, pp.* 289, 290.)

Acts cited and construed:  Acts 1909, ch. 141.

12. SAME. Statute authorizing the taking of railroad terminals and switch yards, without providing for time required to procure others, is due process of law and constitutional, when.

The statute (Acts 1909, ch. 141), authorizing the city of Memphis to acquire, for park purposes, the yards and switchyards, of a

certain railroad company in said city, without providing a system by which it is possible to deal with the particular case, so as to recognize and preserve the property rights of said company, in that no provision was made for said company to use its terminals pending the time which it would require to procure additional terminals or sufficient facilities to enable it to discharge its duty to the public as a common carrier, is due process of law, and said company is not thus deprived of due process of law, because, if the taking of the company's yards will disable it from performing its functions, or if the value of its remaining property is impaired, such facts must enter into the amount of the compensation to be awarded. (*Post, pp.* 290, 291.)

Acts cited and construed:   Acts 1909, ch. 141.

Cases cited and approved:   Navigation Co. v. United States, 148 U. S., 312; United States v. Railroad, 160 U. S., 668; Backus v. Depot Co., 169 U. S., 557.

13. **CONSTITUTIONAL LAW.**   Statute not expressly amending former law is not unconstitutional for failure to recite its title or substance.

The statute (Acts 1909, ch. 141), authorizing the city of Memphis to acquire, by compensation or negotiation, certain specified property for park purposes, is not an express amendment of Acts 1879, ch. 2, nor of Acts 1899, ch. 142, authorizing said city to acquire parks, and, therefore, is not unconstitutional as violating the constitutional requirement (art. 2, sec. 17) that all acts which amend former laws shall recite the title or substance of the law amended; and if it be an implied amendment of said former acts, it does not violate the said constitutional provision. (*Post, pp.* 291, 292.)

Acts cited and construed:   Acts 1909, ch. 141.

Constitution cited and construed:   Art. 2, sec. 17.

Railroad v. Memphis.

14. **SAME. Committee's substituted bill under original title, thereafter passed on its final reading, where original had been passed on its first and second readings, is validly passed, when.**

Where an act originated in the house of representatives, and, after it was passed on two separate readings, it was then referred to a committee, which substituted another bill for the original bill, with the same title, but with essentially different provisions in its body; and, upon recommendation of the committee, the house passed said substituted bill on its third and final reading, treating the passage of the original bill as sufficient to make the final passage of the substituted bill a passage on its third reading; whereupon, the substituted bill was duly passed by the senate and signed, in open session, by both speakers, and approved by the governor, it was held that the bill was passed by the house upon three separate readings as required by the constitution (art. 2, sec. 18.). (*Post, pp.* 292, 293.)

Acts cited and construed: Acts 1909, ch. 141.

Constitution cited and construed: Art. 2, sec. 18.

Cases cited and approved: State v. McConnell, 3 Lea, 332; Williams v. State, 6 Lea, 549; Brewer v. Huntingdon, 86 Tenn.. 732; State v. Algood, 87 Tenn., 163; Nelson v. Haywood, 91 Tenn., 596; Erwin v. State, 116 Tenn., 71; Jackson v. Manufacturing Co., 124 Tenn., 421.

15. **SAME. Same. No difference between substitute bill and amendment by substitution; bill cannot be killed by mere terminology.**

After a bill has passed its second reading, it may be amended by substituting a new body, and there is no substantial reason why it is not just as permissible to offer the same subject-matter under the original title as a substitute for the original bill; for the distinction sought to be made between reporting a substitute bill and an amendment by substitution is more fanciful than real. A legislation bill cannot be destroyed upon mere matter of terminology. (*Post, p.* 293.)

Citations same as under preceding headnote

126 Tenn.—18

16. **EMINENT DOMAIN.  Just compensation is fair cash value, including capabilities and potentialities, whether developed or undeveloped.**

The "just compensation" required by the constitution for the taking of private property for a public use is the fair cash value of the property taken.  The value of the capabilities and potentialities of the property, whether developed or undeveloped, for a particular use at the time of the taking, together with every other element of value, must be considered in determining its then market value, but the speculative value of the property in the hands of a future owner cannot be considered; and where the owner has developed his property, and is using it in the way which possesses a special value to him, "just compensation" requires that he be paid for it at the place and in the form in which it is taken.  (*Post, pp.* 294-296.)

Cases cited and approved:  Woodfolk v. Railroad, 2 Swan, 437; Alloway v. Nashville, 88 Tenn., 510.

17. **SAME.  Same.  Measure of compensation for railroad terminals and switchyards taken in. a city for park purposes.**

Where certain property of a railroad company, including its terminals and switchyards in a certain city, is taken by the city for a public purpose, namely, for public park purposes, the company is entitled to compensation, not only for the value of the land taken as land, but, in addition, for the value of the land in connection with the uses to which it is devoted.  Where the taking of the switchyards destroys the function of the company in the city as a common carrier, it is entitled to compensation for the full value of the use of its terminals to its entire railroad system; and where it does not destroy, but merely permanently impairs its said function, the company is entitled to fair compensation for the degree of impairment which its railroad system suffers, to be ascertained by a comparison of the present yards, in their location and situation in the said city with respect to the patrons of the company in the city, and its connection physically and intangibly with the remainder of the system, with like elements of value to be possessed by new

Railroad v. Memphis.

yards when acquired to replace those taken for park purposes. (*Post, pp.* 296, 297.)

18. **SAME. Same. Same. "Fair cash value" is defined, and includes the peculiar value to owner of property in use by him.**

By "fair cash value," in the rule requiring the payment of the fair cash value of property taken under eminent domain, is meant the market value; but where the property is in actual use by the owner in such way that it possesses a peculiar value to him, which will be sacrificed if placed upon the general market, he is entitled to this value as just compensation for the taking. (*Post, pp.* 297-301.)

Cases cited and approved: Navigation Co. v. United States, 148 U. S., 327 (citing Montgomery Co. v. Bridge Co., 110 Pa., 54); Railroad v. Railroad, 112 Ill., 589 (citing Railroad v. Kirby, 104 Ill., 345).

---

FROM SHELBY.

---

Appeal from the Circuit Court of Shelby County (1st Division) to the Court of Civil Appeals, and by *certiorari* from the Court of Civil Appeals to the Supreme Court.—J. P. YOUNG, Circuit Judge.

CARUTHERS EWING, for Railroad.

JAMES H. MALONE, C. H. TRIMBLE, and PERCY FINLAY, for Memphis.

MR. JUSTICE LANSDEN delivered the opinion of the Court.

The city of Memphis instituted this suit in the circuit court of Shelby county for the purpose of condemning

the switch and terminal yards of the Southern Railway Company located in that city for park purposes. The railway company demurred to the petition, raising many questions upon the demurrer which will be stated more fully hereafter in this opinion. A jury of view was appointed and made report, to which there was exception by all parties, and the case afterwards came on for trial in the regular way before the court and jury. The trial judge, upon the motion of the petitioner below, instructed the jury to return a verdict for the railway company, fixing the value of the property sought to be taken at $392,950. Upon this directed verdict, the court adjudged that the title and interest of the railway company should be divested out of it and its mortgagees upon the payment into the office of the clerk of the court of the sum aforesaid. The railway company made a motion for a new trial, which was overruled, and the case was appealed to the court of civil appeals. That court sustained certain assignments of error made by the railway company, and reversed and remanded the case for a new trial. All parties filed petitions for writs of *certiorari,* which have been granted, and the case has been docketed for argument and heard in the regular way in this court.

In order to a proper understanding of the questions made, it is necessary to set out at some length the scheme of legislation which it is claimed authorized the city to appropriate the property of the railway company by this proceeding. The authority averred in the petition is chapter 141 of Acts of 1909. A statement of the

title and an abbreviation of the body of this act are taken from the brief of counsel for the railway company as follows:

"Then came chapter 141 of Acts of 1909, entitled: 'An act to authorize the city of Memphis to issue bonds in an amount not exceeding $1,000,000 for the purpose of acquiring property for park purposes, and completing the system of parks, parkways and boulevards of the city of Memphis.'

"The legislative council was, by the first section, authorized to issue bonds, not exceeding $1,000,000, 'for the purpose of enabling the city of Memphis, acting through the park commission thereof, to acquire the property known as the "Southern Railway Company yards" in Memphis, Tenn., "and such other property in the vicinity thereof as may in the judgment of the park commission be necessary for park or parkway purposes, and to complete the park, parkway and boulevard system of said city of Memphis." '

"Section 2 prescribes the form of the bond, which contains the following:

" 'The full faith and credit of said city of Memphis is hereby pledged for the payment of the principal and interest of this bond as the same respectively become due, and for the levy and collection of sufficient taxes for that purpose.'

"Section 3 provides:

" 'That said bonds shall be sold by the park commission of said city of Memphis for the best terms offered at such times and at such amounts as the park com-

mission determines, provided that said bonds shall not be sold for less than par.'

"And also:

" 'Said park commission shall have entire charge and control of the sale of said bonds, and the mayor and city register shall execute and deliver the same when called upon so to do by said park commission.'

"Section 4 is as follows:

" 'Be it further enacted, that the entire proceeds of the sale of said bonds shall be paid over to the park commission, and after the payment of the cost of printing and all expenses of the sale of said bonds, the proceeds of sale shall be used as follows:

" '1. Not more than the sum of five hundred thousand ($500,000) dollars shall be used for the acquisition, by private negotiation or condemnation, of the property in the city of Memphis known as the "Southern Railway Company's yards," and such other property in the vicinity thereof as in the judgment of the park commission may be necessary for park purposes, and parkways and boulevards in connection therewith: Provided, that, if said Southern Railway Company's yards cannot be acquired on terms reasonable and proper in the judgment of the park commission of said city of Memphis, bonds to the extent of five hundred thousand ($500,000) dollars only shall be issued hereunder, and the proceeds thereof shall be used as hereinafter provided.

" '2. The residue of the proceeds of sale of said bonds, or, in the event the said Southern Railway Company's

yards cannot be acquired, as provided herein, then the proceeds of sale of bonds in the sum of five hundred thousand ($500,000) dollars shall be used in completing the system of parks, parkways and boulevards of the city of Memphis, and shall be used and expended by said park commission in such manner as it deems best for completing and perfecting said system.'

"Section 5 directs payment of interest on bonds out of taxes collected for park purposes.

"Section 6 authorizes Memphis to pledge its full faith and credit for the bonds and makes it the duty of the legislative council  to levy a tax to pay bonds at maturity."

The specific objections made to the validity of the foregoing legislation and the proceeding under it by which the appropriation of the yards of the company is sought to be had are:

(1)   It is vicious class legislation, and is violative of section 8 of article 1 of the constitution of Tennessee, which provides "that no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property but by the judgment of his peers or the law of the land."

(2)   Section 8 of article 1 above quoted, as well as section 21 of article 1, and the fourteenth amendment to the constitution of the United States, are violated by this legislation, for the reason that a certain and sure

method of compensation to the railway company is not provided.

(3)    The failure to provide a certain and adequate method of compensation likewise violates the due process clause of the constitution of this State and of the United States.

(4)    It violates section 17 of article 2, which provides that all acts which repeal, revive, or amend former laws shall recite in their caption, or otherwise, the title or substance of the act repealed, revived, or amended. Under this assignment, it is insisted that chapter 141 of the Acts of 1909 expressly amends chapter 142 of the Acts of 1899 and chapter 2 of the Acts of 1879, without reciting in its caption or otherwise the title or substance of the acts amended.

(5)    It is insisted that it was not constitutionally passed, for the reason that it was not read and passed on three different days in the house of representatives, and therefore it violates section 18 of article 2 of the constitution of Tennessee.

(6)    While it is conceded that the determination of the necessity, propriety, and expediency of appropriating private property for a public use is with the legislature, it is insisted that this rule does not apply to the appropriation of property devoted to a public use in the same broad sense that it applies to the appropriation of private property.

In its answer the railway company denied that the city needed the land occupied by its switchyards and terminals for park and parkway purposes, and averred

that the selection of its yards for these purposes was purely capricious, arbitrary, and unreasonable, and sought to have this issue submitted to the jury.

The assignments of error made by the city to the action of the court of civil appeals in reversing the trial judge and remanding the case for new trial will be stated and discussed in another part of this opinion.

1, 6. It is difficult to comprehend how the legislation under consideration can be deemed violative of any provision of our constitution or of the fourteenth amendment to the constitution of the United States as vicious class legislation, when the nature of the power of eminent domain and of the character of the legislative enactment are considered. Eminent domain is an inherent attribute of sovereignty. It is without limitation or restriction, except as the people have limited and restricted it by constitutional inhibitions. These are well settled and well defined, and it seems to be one subject about which there is no confusion in the cases. Private property cannot be taken for private purposes at all. This is a power which the sovereign does not possess in a free government like ours, in which sovereignty is not vested in a ruler, but resides in the people. When the government was ordained and established, the people agreed among themselves in a written constitution that no man's property should be taken from him and given to another for his private use, either with or without compensation. And whether an attempted taking of a citizen's property is for a private or a public use is a judicial question, confided by the people to their courts,

to insure a practical enforcement of this constitutional guaranty to the citizen. But where the taking is for a public use, the only remaining restriction on the sovereign power is to pay the fair and reasonable value of the property taken, generally denominated "just compensation." This includes an adequate and sufficient procedure to be provided by the sovereign to ascertain the fair value of the property to be taken, and payment in cash, or a good and solvent bond to secure the payment, at the time the property is taken. And, like the purpose of the taking, these are judicial questions. The founders of the government have not deemed it wise to vest in the same department of government the power to take, and jointly with it the power to determine the character of the taking and the justness of the compensation to be made. *Anderson* v. *Turbeville,* 6 Cold., 150; *White* v. *Railroad,* 7 Heisk., 537; *Ryan* v. *Terminal Co.,* 102 Tenn., 116, 50 S. W., 744, 45 L. R. A., 303; *Water Company* v. *Scott,* 111 Tenn., 328, 76 S. W., 888; *Memphis* v. *Hastings,* 113 Tenn., 142, 86 S. W., 609; *Monongahela Nav. Co.* v. *U. S.,* 148 U. S., 327, 13 Sup. Ct., 622, 37 L. Ed., 463; *Isom* v. *Miss. Central R. R. Co.,* 36 Miss., 300; *Railroad Co.* v. *Cemetery Co.,* 116 Tenn., 400, 94 S. W., 69.

But all other incidents of the taking are political questions, for the determination of the sovereign, and not judicial questions, for the determination of the courts. Selecting the property to be taken, as contradistinguished from similar property in the same locality, determining its suitableness for the use to which

it is proposed to put it, as well as deciding the quantity required, are all political questions, which inhere in and constitute the chief value of the power to take. This power would be a vain and empty thing, if the owner could contest the advisability of taking his property rather than his neighbor's, or if he could interpose as a defense to the taking that other property could be found which would suit the public purposes better, or that he, the owner, was of opinion and could prove that the public needed more or less than the quantity proposed to be taken. The power to take would be of small value, if the thing to be taken, in its quantity, quality, and locality, could be determined by another and adverse interest. The authorities seem to be in harmony, some of which are: *Anderson* v. *Turbeville,* supra; *Shoemaker* v. *United States,* 147 U. S., 282, 13 Sup. Ct., 361, 37 L. Ed., 170; *Boom Co.* v. *Patterson,* 98 U. S., 406, 25 L. Ed., 206; *United States* v. *Gettysburg Electric Ry. Co.,* 160 U. S., 668, 16 Sup. Ct., 427, 40 L. Ed., 576; *Kohl* v. *United States,* 91 U. S., 367, 23 L. Ed., 449; *United States* v. *Fox,* 94 U. S., 320, 24 L. Ed., 192; 10 Am. & Eng. Ency. Law, p. 1069; *I. C. R. R. Co.* v. *Chicago,* 141 Ill., 602, 30 N. E., 1044, 17 L. R. A., 530.

Hence, it has been held that a particular property belonging to a particular citizen can be selected directly for the public use by legislative enactment. *Anderson* v. *Turbeville,* supra; *Shoemaker* v. *United States,* supra; *Railroad Co.* v. *Cemetery Co.,* supra. Public parks are for the benefit of the public, and property taken for such uses falls within a proper exercise of the power

of eminent domain. *Memphis* v. *Hastings,* supra; *Shoe-maker* v. *United States,* supra; *United States* v. *Gettys-burg Electric R. Co.,* supra.

The Southern Railway's terminals and switchyards are now devoted to a public use, so selected and set apart by proper legislative authority; and it is well settled that, before such property can be taken for another and inconsistent public use, there must be express or plainly implied legislative warrant for so doing. *Railroad* v. *Cemetery Co.,* supra; 1 Lewis on Em. Dom., arts. 266, 269, 276; 15 Cyc., 612, 614. But the legislature must have known that all of the property of the Southern Railway Company, including its switchyards in the city of Memphis, which is employed in commercial transportation, is devoted to a public use inconsistent with the use of the same property for a public park; and therefore, when by the act in question, it authorized the city to acquire these yards for parks, it expressly authorized the taking for the other and inconsistent use. So we have a legislative selection of this particular property, already devoted to another and inconsistent public use, directly made by special enactment, which necessarily includes express authority to take it and devote it to the other and inconsistent use.

That such a selection is not condemned by section 8 of article 1, section 21 of article 1, or the fourteenth amendment to the constitution of the United States, follows naturally from what has been said heretofore respecting the origin, extent, and nature of the power of

eminent domain. It exists outside and independent of the constitution.

The reasons which support such an act upon the part of the sovereign power are wholly dissimilar to the reasons which strike down arbitrary selections and classifications as between citizens. It does not require a reason for the selection of property for public uses other than the judgment of the sovereign power expressed in the legislative enactment which directs the taking. A law authorizing a particular person to borrow money at a rate of interest forbidden by law to all others, as in *McKinney* v. *Hotel Co.,* 12 Heisk., 104; a law applying to a particular class of minors and the management of their estates, and not to others, as in *Jones* v. *Perry,* 10 Yerg., 60, 30 Am. Dec., 430; a law singling out a particular sheriff, and requiring a duty of him under penalty for failure to perform it, as in *Mayor* v. *Dearman,* 2 Sneed, 104; a law providing that suits in which the venue has been changed may be moved back to the courts where they were instituted upon affidavits which could only be made by "unconditional union men," as in *Brown* v. *Haywood,* 4 Heisk., 357; a law providing that cities having a certain population and over may sue without giving bond for cost, as in *Memphis* v. *Fisher,* 9 Baxt., 240; a law which deprived lunatic intestates from transmitting their property to their heirs or distributees, as in *Stratton* v. *Morris,* 89 Tenn., 497, 15 S. W., 87, 12 L. R. A., 70; a law applying to counties of a certain population by the census of 1890, as in *Sutton* v. *State,* 96 Tenn., 696, 36 S. W., 697, 33 L. R. A.,

589; a law which forbids a barber to keep his bathroom open on Sunday, and does not prohibit other owners of public baths from doing the same thing, as in *Ragio* v. *State,* 86 Tenn., 272, 6 S. W., 401; a law making it unlawful for a corporation to discharge an employee for voting or not voting at an election, which does not apply to any other citizen, as in *State* v. *Railroad,* 124 Tenn., 1, 135 S. W., 773; a law which exempts the city of Memphis from liability for neglecting its public streets, as in *Fleming* v. *Memphis,* 126 Tenn., 331, 148 S. W. 1057, are each and all violative of the constitutional provisions last above referred to, and furnish typical examples of the application of those constitutional inhibitions against class legislation. The protection which the organic law affords to a citizen against arbitrary discrimination in favor of other citizens, or a particular class of citizens arbitrarily selected, is the same thing in the constitution which forbids the sovereign power to take the property of the citizen for private purposes at all, and which affords the guaranty of the equal protection of the laws. But it is obvious that the selection of a particular piece of property by the sovereign for public purposes falls within and is governed by an entirely different principle from that controlling the cases referred to. The power to take for public purposes necessarily includes the power to select that which is to be taken.

2, 3. As seen from the foregoing statement of the case, chapter 141, Acts of 1909, authorized the city of Memphis, acting through the park commission thereof,

"to acquire the property of the railway company for park purposes," and in the fourth section it was directed that the entire proceeds of the sale of the bonds authorized to be issued for the purposes of paying for the railway company's yards should be paid over to the park commission, and that not more than $500,000 of the proceeds of the sale of the bonds should be used for their acquisition by "private negotiation or condemnation," provided "that if said Southern Railway Company's yards cannot be acquired on terms reasonable and proper in the judgment of the park commission of said city of Memphis, bonds to the extent of $500,000 only shall be issued hereunder, and the proceeds thereof shall be used as hereinafter provided." From this it is argued that the power of condemnation is vested in the city, but the authority and ability to pay for the land condemned is vested in the park commission only; that the park commission has no power to condemn, and stands in relation to the condemnation proceedings as a third party, vested with full discretion to refuse to take and pay for the property after the city has condemned it, and as the city has no funds available, except from the bond issue authorized by this act, it is not vested with both the power to condemn and the ability to pay.

If this legislation were susceptible of the construction placed upon it by counsel, there would be no difficulty in determining that it is invalid. As was said by this court in *Water Company* v. *Scott,* 111 Tenn., 321, 76 S. W., 888: "Eminent domain laws for the taking of property for public use must provide for just compen-

sation, and the mode and manner of ascertaining and enforcing the same or such laws will be unconstitutional and void." *City of Memphis* v. *Hastings,* supra. But the plain meaning of this act is that the city of Memphis is authorized to invest not exceeding $500,000 in the acquisition of this property for park purposes. As the city is an artificial person, and must act through an agency, the park commission is selected to investigate the value of the property in mind and determine whether it can be acquired for the maximum amount fixed by the legislature, either by private negotiations or by condemnation. If the park commission, after such investigation, should determine that the property sought to be acquired is worth more than the amount fixed as the maximum price, it would be useless for the city to undertake to acquire the property, either by private negotiations or by condemnation. It is not denied that it is entirely competent for the legislature to fix the maximum price at which the city will be permitted to acquire the property for a park, and upon the authorities it could not be. *Shoemaker* v. *United States,* supra; *United States* v. *Gettysburg Electric R. R. Co.,* supra. Such determination by the legislature is not an attempt to fix a valuation of the property that would be binding upon the owner, or a direction to the court or jury to find the true value within the limit so fixed. It is merely an expression of the legislative judgment as to the amount which the city can prudently invest in an enterprise of this sort. The question whether this contemplated improvement is wise or unwise cannot be an-

Railroad v. Memphis.

swered by the city authorities until they know the expense that it involves. This proceeding was instituted by the city of Memphis, and the title and interest of the owners were decreed to be vested in the city only upon payment into court by the city of the sum fixed as the true valuation of the property. This practical construction placed upon the statute in the court below is manifestly its true meaning, and is one which does no violence to any right of the property owner. The fact that the park commission has charge of the sale of the bonds, and that the proceeds to be derived from their sale is to be placed to the credit of the commission, is a matter which does not concern the railway company under the decree herein. Before the city can take possession of the property, and before it can require the railway company to make any preparation to vacate it, it must either pay the money into the registry of the court or execute a bond properly conditioned so to pay. The stage of the proceedings at which the petitioner can dismiss its suit is fully discussed in *Cunningham* v. *Terminal Company*, 126 Tenn., 343, 149 S. W., 103. With the qualifications therein stated, the rights of all parties are properly safeguarded.

The procedure for ascertaining the value of the property sought to be condemned is a matter of legislative regulation. Lewis on Eminent Domain, vol. 2, p. 1669; *B. & S. R. R. Co.* v. *Nesbit*, 10 How., 395, 13 L. Ed., 469. The act under consideration selects the property which it is proposed to condemn, and fixes the maximum price which the city is authorized to pay. The

126 Tenn.—19

procedure in condemnation suits is well established and well understood in this State, and is clearly defined by our Code and the decisions of this court construing it. This act was passed with reference to the established mode of procedure in such cases existing at the time. The institution and trial of this case demonstrates that there was no confusion in the minds of counsel or the court as to what the proper procedure is. If the investigation, according to this procedure, develops that the fair valuation of the property of the railway company does not exceed $500,000, the city is authorized to acquire it. If, however, such investigation should show, under the rules for ascertaining the value hereinafter to be stated, that the property is worth exceeding $500,-000, the power of the city to acquire it under this act is at an end. Under the principles hereinbefore stated, it is not possible that the city can acquire it without paying its fair and reasonable value. The fact that the maximum price of $500,000 is placed upon the property does not prevent the railway company from insisting upon and receiving just compensation for the property sought to be taken.

It is further said that the legislative scheme for taking the yards of the railway company is not due process of law, because it has not provided a system by which it is possible to deal with this particular case, so as to recognize and preserve the property rights of the company, in that no provision is made for the company to use its terminals pending the time which it would require to procure additional terminals of suffi-

cient facilities to enable it to discharge its duty to the public as a common carrier of freight. As stated by the supreme court of the United States in *Backus* v. *Fort Street Union Depot Co.,* 169 U. S., 557, 18 Sup. Ct., 445, 42 L. Ed., 853, in defining what constitutes due process of law in such cases: "All that is essential is that, in some appropriate way, before some properly constituted tribunal, inquiry shall be made as to the amount of compensation; and when this has been provided there is that due process of law which is required by the federal constitution."

If the taking of the company's yards disables it from performing its functions, or if the value of the remaining property is impaired, such facts should enter into the question of the amount of the compensation to be awarded. *U. S.* v. *Gettysburg Electric R. R. Co.,* supra; *Monongahela Nav. Co.* v. *U. S.,* 148 U. S., 312, 13 Sup. Ct., 622, 37 L. Ed., 463.

4. It is claimed that the act under consideration expressly amends chapter 142 of the Acts of 1899 and chapter 2 of the Acts of 1879, without reciting in its title or otherwise the title or substance of the laws amended. The act of 1899 authorized taxing districts to acquire parks, to exercise power of eminent domain within certain limits, to issue bonds not exceeding $250,000 to pay for land to be acquired for parks, to levy a tax to maintain the parks, to construct parkways, etc., and to elect park commissioners. Viewing this statute with the one under consideration as construed by us in this opinion, it appears quite plainly

that the act of 1909 is not amendatory of the act of 1899, or any other act. The argument is that the act of 1909 shows upon its face that the city of Memphis has an incompleted system of parks which was begun under authority of the act of 1899, and the act of 1909 was passed to enable the city to complete the system. Therefore it is. concluded the act of 1909 amends the act of 1899. The conclusion does not follow the premise. The act of 1909 selects the property to be taken, and places a maximum price upon it, and does not interfere with the act of 1899 in any way. It does not purport upon its face to amend the former acts, and that of itself is sufficient to show that it is not an ·express amendment. If it is an implied amendment, it does not violate the constitutional provision relied upon.

5. Chapter 141 of the Acts of 1909 originated in the house of representatives as Bill No. 175. It passed the house upon two separate readings, and was then re- ferred to the committee on municipal affairs. The com· mittee substituted another bill for the original bill, the body of which was essentially different to the original; but the title remained the same. Upon the recommen- dation of the committee, the house passed the substi- tuted bill upon its third and final reading, treating the passage of the original bill upon its two separate read- ings as sufficient to make the final passage of the sub- stituted bill a passage upon its third reading. The sub- stituted bill as thus passed was transmitted to the sen- ate, and there passed upon its third and final reading. in a manner to which no objection is made. As thus

Railroad v. Memphis.

passed, the bill was signed in open session by both speakers and approved by the governor, and appears in the published acts as House Bill No. 175. It is insisted that the bill passed the house on only one reading, for the reason that the substitute was essentially different from the original, and there was no effort made in the house to amend the bill, either by striking out all after the enacting clause, or by substitution. It is said the committee on municipal affairs simply reported a substitute for House Bill No. 175. The distinction sought to be made between reporting a substitute bill and an amendment by substitution is more fanciful than real. As stated, the title of the bill remained the same, and the substitute offered for the original is germane to the title, and is otherwise unobjectionable. The bill cannot be destroyed upon a mere matter of terminology. If it were competent, as is conceded, for the original bill to have been amended by substitution, so as to ingraft upon it the same matter that was contained in the substitute bill, we can see no substantial reason why it is not just as permissible to offer the same subject-matter under the original title as a substitute for the original bill. This undoubtedly falls within the principle stated by this court in *Erwin* v. *State*, 116 Tenn., 71, 93 S. W., 73. See, also, *Williams* v. *State*, 6 Lea, 549; *State* v. *McConnell*, 3 Lea, 332; *Brewer* v. *Huntingdon*, 86 Tenn., 732, 9 S. W., 166; *State* v. *Algood*, 87 Tenn., 163, 10 S. W., 310; *Nelson* v. *Haywood*, 91 Tenn., 596, 20 S. W., 1; *Jackson* v. *Manufacturing Co.*, 124 Tenn., 421, 137 S. W., 757.

As stated heretofore, the court of civil appeals sustained certain assignments of error made in that court to the action of the trial judge in excluding certain testimony offered by the railway company tending to fix the value of the property sought to be taken, and also an assignment to the action of the trial judge in peremptorily directing a verdict fixing the amount of the railway's damages at $392,950. We are content with all that court has said upon the assignment in respect of the action of the trial judge in directing the verdict, as well as what was said with reference to the easement claimed by the city on the 1.47 acres. But we deem it proper to set out in this opinion the true measure of the railway's damages for the property sought to be taken, so that upon another trial the value of the property may be correctly ascertained. In the court below, it seems. to have been considered that the proper measure for ascertaining the value of the property in question was laid down by this court in *Alloway* v. *Nashville,* 88 Tenn., 510, 13 S. W., 123, 8 L. R. A., 123. After stating the rule laid down in *Woodfolk* v. *Railroad Co.,* 2 Swan, 437, to the effect that the just compensation required by our constitution is the fair cash value of the land taken, estimated as if the owner were willing to sell and the petitioner desired to buy that particular quantity at the place and in the form at and in which it is sought to take it, it was said:

"It includes every element of usefulness and advantage in the property. If it be useful for agricultural or for residence purposes, if it has adaptability for a

reservoir site or for the operation of machinery, if it contains a quarry of stone or a mine of precious metals, if it possesses advantage of location or availability for any useful purpose whatever, all these belong to the owner, and are to be considered in estimating its value. It matters not that the owner uses the property for the least valuable of all the ends to which it is adapted, or that he puts it to no profitable use at all. All its capabilities are his, and must be taken into the estimate.

"This does not mean that all the capabilities are to be priced separately and the aggregate put down as the true value, for they do not exist independently of each other, and cannot all be realized at the same time; nor will it do to restrict the estimate to any one of them, because in one view that would exclude the other elements altogether, and in another view it would tend to make the degree of benefit to the party appropriating and condemning for a particular purpose the real measure of value, which is never allowable."

By the foregoing it was clearly not meant to modify the holding of this court in *Woodfolk* v. *Railroad Co.*, supra, to the effect that the property must be taken and paid for at its fair cash value *in statu quo*. The court was speaking especially with reference to the capabilities of the property, so as to include every element of usefulness and advantage which it possesses, either as an accomplished fact after exploitation by the owner, or as a potentiality in his hands. It was properly held

that the speculative value of the property in the hands of the future owner could not be inquired into, but that the value of its capabilities for a particular use belonged to the owner at the time of the taking, and these potential values should be considered, together with every other element of value, in ascertaining its then market price. It was not meant that, if property is taken after it has been devoted by the owner to a special use which possesses a special value to him, this value should be eliminated, and the property appraised as if in its undeveloped state. Its capabilities for exploitation are an essential element of value, and belong to the owner in the same degree as does the physical property itself. But if the owner has developed his property, and is using it in a way which possesses a special value to him, and if the public takes it for public use, just compensation requires that he be paid for it at the place and in the form in which it is taken. This we conceive to be the true meaning of the rule stated in *Alloway* v. *Nashville,* supra, when read in connection with *Woodfolk* v. *Railroad,* supra.

So the railway company is entitled to be compensated not only for the value of the land taken as land, but, in addition, the value of the land taken in connection with the uses to which the owner is devoting it. If the taking of its switchyards destroy the function of the railway company in the city of Memphis as a common carrier of freight, it is entitled to be compensated for the full value of the use of its terminals to its entire system of road. If it do not destroy, but merely permanently im-

pair it, it is entitled to fair compensation for the degree of impairment, which its system of road suffers from the taking. This is to be ascertained by a comparison of the present yards in their location and situation in the city of Memphis with respect to the patrons of the road in the city, as well as its connection physically and intangibly with the remainder of the system, with the like elements of value to be possessed by the new yards when acquired to replace those taken for park purposes. By this it is not meant that the value of the present terminals can be ascertained by the cost to the railway company of other yards to be acquired by it in the place of those about to be taken. The true rule is the fair cash value of the property taken at the place and in the form at which it is taken, having in view its value for the uses to which it is being devoted by the owner at the time of the taking, together with all other elements of value of which it is capable. A citizen whose property is taken for public use is not required to sacrifice any part of the actual and permanent present value of his property. Just compensation forbids this.

By fair cash value is generally meant the market value; but if the property is in actual use by the owner in such way that it possesses a peculiar value to him, which would be sacrificed if placed upon the general market, he is entitled to this value, and just compensation requires that he shall be paid for it. The rule is aptly stated by the supreme court of Illinois in *C. & N.*

*W. R. R. Co.* v. *C. & E. R. R. Co.,* 112 Ill., 589, as follows:

"Now, it is manifest that by reason of the use to which this property is applied, and its connection with the company's business generally, it has a special value to the company which it does not have to any one else, and which the general market value or other property in that locality not thus circumstanced throws but little, if any, light upon, much less furnishes a rule by which to determine its value. Strictly speaking the market value of anything is determined by what it would sell for in market in due course of business, and this is ascertained by actual sales or offers for like articles. This applies to land, as well as anything else. But the term is sometimes used in a more extended sense, as including the estimation which well-informed persons would put upon an article in the absence of a market value, in the strict sense of that term, and this kind of evidence is always admissible to show value. We know, as a matter of common experience, that railway companies rarely, if ever, sell out their tracks, depot grounds, or other like property by piecemeal. At least, such transactions, we apprehend, are of so rare occurrence as to afford no evidence of a market price for that kind of property. . . . It is a part of a great railroad property and is an important factor in the handling and transportation of freight in the heart of a great city by the company owning it. Many illustrations might be given where property evidently has no market value, but one will suffice. Take the case of a railroad cross

Railroad v. Memphis.

ing: The value of the part of the track taken for such crossing cannot be ascertained by any reference to market values, and if determined by the value of land taken at customary prices of land in the neigborhood, the value in most cases would be inappreciable; and yet to the company who owns the track it always has a substantial value that well-informed, intelligent railroad men would readily know how to estimate. Where in the nature of things there can be no market value of a piece of property, by reason of being used in connection with and as a part of some extensive business or enterprise, its value must be determined by the uses to which it is applied. While in such cases the market value of neighboring lands differently circumstanced may be looked to as throwing some light upon the question, yet that alone would fall far short of furnishing a true or adequate test of the value of the property. As was said in *Railroad Co.* v. *Kirby,* 104 Ill., 345: 'The value of land consists in its fitness for use, present or future, and before it can be taken for public use the owner must have just compensation. If he has adopted a peculiar mode of using that land by which he derives profit, and he is to be deprived of that use, justice requires he should be compensated for the loss. That loss is the loss to himself. It is the value which he has, and of which he is deprived, which must be made good by compensation.' Substantially the same idea is well expressed in the English case of *Beckett* v. *Midland Railway Co.,* L. R., 3, C. P., 82. It was there said: 'The property is to be taken *in statu quo,* and to be consid-

Railroad v. Memphis.

ered with reference to the use to which any owner might put it in *its* then condition.' This statement is regarded as quite accura'te, and it will be observed it fully meets the case where the property sought to be taken has some special value to the owner, by reason of his having adopted some particular, use of it. This might happen on a farm, as well as in a city or town. For illustration : Suppose the owner of a farm concludes to go into the dairy business, and proceeds to spend several thousands of dollars on his farm in preparing stalls and sheds for his cows and in making suitable preparations for the handling of the milk and converting it into butter and cheese. When the farm is thoroughly fitted up for this purpose, it is very clear it would have a special value to him that it would not have to any one else, unless to some one who should want it for the same purposes. One who wanted it for mere farming purposes could afford to pay but little more for it on account of its adaptation to the dairy business; and assuming that was the only dairy farm in that locality, it is clear there could be no market value for a farm thus situated, while there might, and probably would, be a market value for farms like that adapted to farming purposes merely. Suppose in the case we have put, a railway company, having the right to locate its road across this farm, so locates its tracks as to completely destroy all the improvements that have been made in fitting up for dairy purposes, but not at all injuring the farm otherwise. Now, is it not manifest that in such a case to limit the owner's compensation to the market

value of the land taken would be grossly unjust and inadequate? And yet, in principle, we see no difference between the case suggested and the one in hand. In condemnation cases the owner of the property is not required to make any pecuniary sacrifices at all." *Monongahela Nav. Co.* v. *U. S.*, supra.

In the cast last cited, Mr. Justice Brewer, speaking for the court, said:

. "Because congress has power to take the property, it does not follow that it may destroy the franchise without compensation. Whatever be the true value of that which it takes from the individual owner must be paid to him before it can be said that just compensation for the property has been made. . . . If a man's house must be taken, that must be paid for; and if the property is held and improved under a franchise from the State, with power to take tolls, that franchise must be paid for, because it is a substantial element in the value of the property taken"—citing *Montgomery County* v. *Schuylkill Bridge Co.*, 110 Pa., 54, 20 Atl., 407.

The result is that the judgment of the court of civil appeals is affirmed, and the case is remanded for a new trial in accordance with this opinion.